UNITED STATES DISTRICT COURT
SOUTHERN DISRICT OF NEW YORK

-----------------------------------------------------------x

KEVIN FLOOD, individually and on behalf of
all others similarly situated,

          Plaintiff,

   v.

JUST ENERGY MARKETING CORP.,
JUST ENERGY NEW YORK CORP., and
JUST ENERGY GROUP, INC.

         Defendants.

-----------------------------------------------------------x

**JUDGE ROMAN**

Case No.:

CLASS ACTION
JURY DEMAND

**15 CV 2012**

## INTRODUCTION

1.   Plaintiff Kevin Flood brings this action against his former employer, Defendants Just

Energy Marketing Corp., Just Energy New York Corp., and Just Energy Group, Inc. (collectively

referred to herein as "Just Energy") for unpaid wages and overtime pursuant to the Fair Labor

Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") and the New York Labor Law § 650 *et seq.*

Plaintiff brings this case individually, as a collective action under the FLSA and a class action

under the New York Labor Law on behalf of all persons who worked by going door-to-door

soliciting new accounts for Just Energy (the "Class"). Defendants improperly classified Plaintiff

and the other members of the Class as exempt independent contractors, when in fact they were

treated in all material respects as employees. Defendants failed to pay Plaintiffs and the other

members of the Class the minimum wage for all hours worked and also failed to pay overtime

wages for all hours worked over 40 hours per week. Plaintiff and the other members of the Class

were "non-exempt" employees and thus entitled to such wages under state and federal law.

2.     In 2012, a similar action captioned *Hurt v. Commerce Energy, et al.*, 12-cv-00758

(JSG)(N.D. Ohio) (the "Hurt Action") was brought against Just Energy and its Commerce Energy

subsidiary doing business in the states of Ohio, California, Georgia, Maryland, Massachusetts,

1

New Jersey, Ohio and Pennsylvania for violation of the FLSA and the Ohio Wage and Act for the misclassification of its sales employees as exempt independent contractors and for failing to pay its sales employees minimum wage and overtime. The case proceeded to a trial and a verdict was rendered in favor of the Hurt plaintiffs. On March 10, 2015, the Northern District of Ohio denied the Just Energy Defendants' motion for judgment as a matter of law and motion for a new trial, See Exhibit A hereto. Plaintiff Flood seeks to represent himself and all other Just Energy door-to-door marketing and solicitation persons in New York and in the other states in which Defendants are doing business and who were not included in the Hurt Action.

## JURISDICTION & VENUE

3.      Jurisdiction in this case is based on 28 U.S.C. §§ 1331, 1332 and/or 1337. This action arises under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* Jurisdiction over the state law claim is pursuant to 28 U.S.C. §1367.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendants are authorized to conduct business and have conducted substantial business in this district, have intentionally availed themselves of the laws within this district and are subject to personal jurisdiction in this district.

## PARTIES

5.      Plaintiff Kevin Flood is a citizen of New York and resides in Hastings-On-Hudson. From approximately September 28, 2011 through December 1, 2014, Plaintiff worked in door-to-door marketing and solicitations for Defendants and was misclassified by Defendants as an exempt independent contractor. Plaintiff brings this action individually and as a collective action under the FLSA for the past three years, and a class action under the New York Labor Law for the past six years, for all persons who (a) were listed on their Just Energy contract as performing services for the "Just Energy Marketing Corp" and/or "Just Energy New York" affiliates of Just Energy; (b) were misclassified as exempt

2

independent contractors when they functioned as employees; (c) had the job of marketing and soliciting customer accounts for Just Energy by going door-to door; (d) were not paid minimum wage for all hours worked and at a rate of time and a half for overtime; and (e) who are not included in the Hurt Action.

6.  Defendant Just Energy Group, Inc., is a Canadian for-profit corporation doing business in New York.  Its headquarters are located at 7345 Dixie Road, Suite 200, Mississauga, Ontario, L5T 2E6, Canada.  It is publicly traded on the New York Stock Exchange under the symbol "JE".  Just Energy Group Inc. was previously known and doing business in the United States as "US Energy Savings".

7.  Defendant Just Energy Marketing Corp. is Delaware for-profit corporation doing business in New York.  Defendant Just Energy Marketing Corp., is a subsidiary of Defendant Just Energy Group, Inc.

8.  Defendant Just Energy New York Corp. is Delaware for-profit corporation doing business in New York.  Defendants Just Energy New York Corp. is a subsidiary of Defendant Just Energy Group, Inc.

9.  Each named Defendant is collectively referred to herein as "Defendants." Defendants' business primarily involves the marketing and sale of natural gas and/or electricity supply to residential and commercial customers under long term fixed price, price-protected or variable-priced contracts and green energy products.  Defendants employ persons such as Plaintiff and the Class to go door-to-door and market Defendants' services to potential customers and to solicit new accounts.  Defendants operate in Canada and in the United States across approximately 13 states.

## FACTUAL ALLEGATIONS

10.  Plaintiff and other members of the Class are persons who are working or have worked for Defendants by going door-to- door with the objective of recruiting potential

customers to apply for Defendants' and/or their affiliates' energy products and services.

11.     The work performed by Plaintiff and the putative class members is the primary way in which Defendants get customers to apply for their and/or their affiliates' energy products and services.

12.     At or around the time of hiring, Defendants trained Plaintiff and other Class members on the business of Just Energy, the procedures to follow in presenting the Just Energy program to potential customers, and the requirements to comply with in performing their job duties. Plaintiff and the Class were given a written script to use when meeting with the customers.

13.     Defendants required Plaintiff and other Class members to follow specific company rules when meeting with potential customers.

14.     Plaintiff and other members of the Class typically worked for Defendants from 9:00 am to 9:00 pm, and were required to work a minimum of five days per week.  Often, Plaintiff and the other members of the Class were required to work more than 12 hours per day and also were pressured by Defendants to work seven days per week.  Indeed, all door-to-door marketing and solicitation persons were required by Defendants to work the same and/or similar schedule which was fixed by Just Energy and not controlled by the workers.

15.     Defendants required Plaintiff and the Class to wear Just Energy badges each day that they worked soliciting business door-to-door. Defendants also required Plaintiff and the other workers to wear standard uniforms which consisted of a hat with the Just Energy logo, a shirt with the Just Energy logo, and a jacket with the Just Energy logo (during the winter months) when visiting households to make the Just Energy presentation.  Defendants expected the putative class members to wear the same and/or similar uniforms. Defendants, moreover, prohibited Plaintiff and the other members of the Class from wearing the color blue during work because this color was associated with the competitors of Defendants.  Defendants required

4

Plaintiff and the other members of the Class to purchase the Just Energy uniform attire.

16.     Defendants required Plaintiff and the other members of the Class to report to the Just Energy office by 9:30 am every morning and to report back to the Just Energy office at the end of the work day, which usually was between 9:00 pm and 10:00 pm.

17.     Defendants decided the geographic area or territory in which Plaintiff and the Class were required to work in a given day and/or week.

18.     On a typical day, Defendants directed Plaintiff and the other members of the Class to report to the Just Energy office every morning by 9:30 am.  Typically, from 10 am to 11 am, Plaintiff and other members of the Class were required to attend a mandatory meeting with their supervisors.  During this time, presentations about Just Energy and its products, including door-to-door solicitations role-playing, were given to the workers.  The workers were required to rehearse their marketing pitch at this meeting.  From 11:00 am to 11:30 am, Plaintiff and the other members of the Class were required to listen to Defendants' company announcements. The Defendants then assigned specific geographic areas for Plaintiff and the putative class members to solicit potential customers. Just Energy would designate a grid of four to five streets each day for the workers to canvass and solicit business door-to door.  Plaintiff and the other members of the Class were prohibited from mapping out their own territories.  Just Energy would then transport Plaintiff and/or putative class members to the territory and back to the office at the end of the shift, or if the shift involved overnight road trips, at the end of the trip.  This transporting was often done in a Just Energy company van.  Plaintiff and other members of the class were then sent out in the field to solicit new customers and were required to work until 9:00 pm.  On most days, a Just Energy van would round up the workers from the field around 9:00 pm and then bring them back to the Just Energy office.

19.     Plaintiff and the Class were limited to working only within specific geographic areas that the Defendants permitted, either traveling with the group or getting specific permission

5

to work in some other area.

20.     Plaintiff and the other members of the Class did not have access to the internal, Just Energy information, to determine which areas are selected for marketing. For example, they do not know which areas were recently marketed by other Just Energy teams; which areas were recently marketed by competitors; and, other than being told by Just Energy, which areas may lawfully be canvassed by Just Energy.

21.     Plaintiff and the other members of the Class did not have a contract to perform work for Defendants for a set period of time. Rather, as set forth in their contracts, Plaintiff and the other Class members have the ability to work for Defendants indefinitely, subject to Plaintiff's and the putative class members' right to resign and Defendants' right to terminate them. In other words, Plaintiff and the other members of the Class were treated as employees at will.

22.     When Plaintiff and the putative class members would go to a potential customer's door, they were required to use only those materials created by Defendants, including a company brochure and a customer application. Defendants required Plaintiff and the Class to present these items to the potential customers.

23.     Defendants had ultimate decision making power when deciding whether to confirm the customer account sales which were solicited by Plaintiff and the other members of the Class. Indeed, the sale was not complete until four things occur: First, Defendants (through workers other than Plaintiff and the putative class members) speak with each potential customer who signed the application and require the potential customer to go through a phone verification process. Second, the Defendants require the Plaintiff and the putative class members to submit the signed application to the regional Just Energy office for review to ensure that all the required information is complete and to run a credit check on the potential customer. Third,

the Defendants send the completed application to Just Energy's Head Office in Mississauga, Ontario for processing.  Fourth, the utility company (whom Defendants contract with to provide the service to the potential customer) must approve the potential customer for Defendants' program. There are a myriad of reasons outside the control of the Plaintiff and the putative class members as to why a sale might not occur.  Thus, even though a potential customer may have signed the application solicited by Plaintiff, Plaintiff and the other members of the Class were not entitled to receive a sales commission until further approval by Defendants. Defendants retained "sole discretion" to accept or reject a customer's application.  Indeed, the applications obtained by Plaintiff and other members of the Class were merely proposals until the Defendants accepted them.

24.    If any of the above requirements do not occur, Defendants will not provide the customer with its energy service and similarly, a potential customer is not bound to buy Defendants' energy service.  As a result of the pre-requisites needed for a customer to obtain Defendants' energy service, Plaintiff and the putative class members can never complete the sale to the potential customer at the time they meet with the potential customer and have them sign the application.

25.    Not all potential customers that fill out an application satisfy the pre-requisites to obtain Defendants' energy service.  But for each potential customer who satisfied all requirements to obtain Defendants' service (*i.e.*, signs the contract, completes the verification process, and is approved by the gas and/or electric company), Plaintiff and other members of the Class were to receive a commission payment from Defendants based on the amount of energy consumed by the account, or the Residential Consumption Equivalent ("RCE").[1] Plaintiff and the other members of the Class were to receive a commission payment of $35 per

---

[1] An RCE is the equivalent of 300 therms annually for gas and 10,000 kilowats annually for electric.

RCE for electric and $40 per RCE for natural gas. Defendants, however, reserved the right to reduce and did reduce the commission structure in their sole discretion.

26.     When a customer cancelled the account with Just Energy within the first year, Defendants would clawback the entire earned commissions from Plaintiff and the other members of the Class.  Moreover, if a customer called Just Energy with a question about his or her account, it was the common practice of Just Energy to reclassify the account, or cancel the account and then reinstate the account, as an "in house" account in order to prevent Plaintiff and the other members of the Class who originated the account from continuing to earn commissions for the life of the account based on RCEs and/or to trigger the clawback for cancelled accounts.

27.     In addition, Plaintiff and other members of the Class spent numerous hours handing out advertising pamphlets on the street for the Defendants.  Plaintiff and the other members of the Class would place their "independent contractor" number at the bottom of the solicitation pamphlet.  If a potential customer called Defendants to establish an account, Defendants were supposed to credit the sale to the "independent contractor" whose number appeared at the bottom of the solicitation form.  Plaintiff and the other members of the Class spent countless hours handing out thousands upon thousands of these solicitation pamphlets to potential customers, but Plaintiff was never once credited with a sale by Defendants.

28.     As a result of Defendants' method of compensating Plaintiffs and the putative class members, Plaintiff and the putative class members have not always been paid minimum wage for all hours worked in a given week, and in some weeks have not received any pay.

29.     In some weeks, Plaintiff and other Class members worked extremely long hours for Defendants but did not receive any pay.  This was especially true when Plaintiff and other members of the putative class were required to go on road trips, called "push weeks" or "jump out of the jar" weeks, on behalf of Just Energy.  These road trips often lasted an entire week

during which Plaintiff and other members of the class were required to work twelve hour days soliciting new customers in more remote regions. Frequently, these road trips would overlap with holidays during which Plaintiff and the other members of the Class were required to work. Plaintiff and other members of the Class could not choose when or where the road trips occurred. Instead, the timing of the road trips, the geographic area for solicitation and the hotels where Plaintiff and the other members of the Class were required to stay were all chosen by Defendants. Plaintiff and other members of the class, moreover, were required to pay Defendants for their hotel rooms out of their own pockets. Defendants required Plaintiff and the other members of the Class to participate in the "push week" or "jump out of the jar" road trips in order to keep their jobs. These mandatory road trips occurred once to two times per month. On several occasions, Plaintiff and the other members of the Class would return at approximately 3:00 am on a Monday from a mandatory week long road trip and were required to report to the Just Energy office by 9:30 am that morning.

30.     Defendants also failed to pay Plaintiff and the Class overtime pay for the hours they worked over 40 hours per week. Plaintiffs and the Class members were always only paid commissions.

31.     When the door-to-door marketing and solicitations workers were terminated or resigned, it was the common practice of Defendants not to pay workers for the final several weeks of work performed by them on behalf of Defendants.

32.     Plaintiff and the Class were employees of Defendants. Indeed, the following factors show that Defendants misclassified Plaintiff and other Class members as independent contractors when, in fact, they were employees of Defendants entitled to minimum wage and overtime:

    a.  All contracts for energy solicited by Plaintiff and other Class members had to be

approved by Defendants.

b.   Defendants instructed Plaintiff and other members of the Class when the work was to be completed, where the work was to be performed and how the work was to be performed.

c.   Defendants required Plaintiff and other members of the Class to report to Just Energy on a regular basis.

d.   Plaintiff and other members of the Class were required to submit reports to Defendants.

e.   Defendants inspected and reviewed the work of Plaintiff and other members of the Class.

f.   Defendants provided Plaintiff and other members of the Class with mandatory training at Just Energy's offices so that they would perform their services to Defendants' specifications.

g.   Plaintiff and other members of the Class could not take time off from work without Defendants' prior knowledge and approval.  Indeed, Plaintiff and other Class members often were required to work holidays and commonly were refused time off to attend funerals, weddings, and other important family events.  Defendants threatened to and did fire workers who took time off without prior approval from Defendants.

h.   Defendants' established the rate of pay for Plaintiff and the other members of the Class.

i.   Defendants assigned the specific territories to Plaintiff and the other members of the Class.

j.   Defendants required Plaintiff and other members of the Class to attend meetings at Just Energy, to report to work at a specific time and to work a set number of hours each week and established mandatory minimum hours of work per week.

k.   All contracts and customers solicited by Plaintiff and other members of the Class were subject to approval by Defendants.

l.   Plaintiff and the other members of the Class were prohibited from performing similar services for other companies that compete with the business of Defendants  while working for Defendants.

m.   Plaintiff and the other members of the Class could not refuse work assignments, including, but not limited, "push week" road trips.  Defendants made it clear that anyone who refused work assignments would be terminated.

n.  Plaintiff and the other members of the Class were required to complete a job application prior to hire by Defendants.

33.  Attached hereto as Exhibit B are the findings by the New York State Department of Labor that the workers employed by Just Energy when it was known in the United States as New York Energy Savings Corp. d/b/a US Energy Savings were misclassified as independent contractors but were actually employees based on factors similar, if not identical, to those listed above in paragraph 32 with respect to Plaintiff and the Class here.

34.  Plaintiff and the other members of the Class were "non-exempt" employees under the state and federal wage and hour law, as nothing about their pay, title, duties, or anything else qualifies them for any exemption under state or federal law. Non-exempt employees are entitled to a minimum wage for all hours worked and for overtime wages for all hours worked over 40 per week.

35.  Plaintiff and the putative were not paid for all hours worked and were not paid overtime wages for the hours they worked over 40 per week.

36.  The exact amounts Plaintiff's and the other Class members' pay was deficient of minimum wage and/or overtime pay in each given week during their employment can be determined in part by Defendants' pay records.

**COLLECTIVE ACTION ALLEGATIONS**

37.  Plaintiff incorporates by reference the foregoing allegations as if set forth herein.

38.  Plaintiff brings this action individually and as a representative for a collective action under the FLSA on behalf of all persons working for Defendants at any time during the period from three years of the date of the filing of Plaintiff's complaint and who meet the definition of the putative class members set forth above.

39.  Plaintiff and the other members of the Class are similarly situated and Plaintiff

will prosecute this action vigorously on behalf of the Class.

40.     Plaintiff, through his counsel, will file a request under 29 U.S.C. Section 216 for this Court to provide other similarly situated current and former workers with notice and an opportunity to opt-in to this proceeding and to be subject to this Court's decision, or that of the fact finder, on the right to the wages and overtime described above.

## CLASS ACTION ALLEGATIONS

41.     Plaintiff incorporates by reference the foregoing allegations as if set forth herein.

42.     Plaintiff brings this action individually and in a representative capacity on behalf of a class of persons who have worked for Defendants (or Defendants' predecessors, including New York Energy Savings Corp. d/b/a US Energy Savings) in New York and who meet the definition of the putative class members set forth above during any time in the six years prior to the date of filing Plaintiff's complaint.

43.     There are at least 100 persons, if not more, in the Class (the exact number will be in Defendants' records), and the Class is so numerous that joinder of all members is impracticable.

44.     Defendants have engaged in the same conduct towards Plaintiff and the other members of the Class.

45.     The claims, defenses, and injuries of Plaintiff are typical of the claims, defenses, and injuries of the class, and the claims, defenses, and injuries of the class members within the class are typical of those of the entire class.

46.     The injuries and damages to the Class present questions of law and fact that are common to each class member within the Class, and that are common to the Class as a whole

47.     Plaintiff will fully and adequately protect and represent the class, and all of its putative class members.

12

48.     The identity of all members of the class cannot be determined at this time, but will be so determined at a later time upon obtaining discovery from Defendants and others.

49.     The prosecution of separate actions by each member of the Class would create a substantial risk of inconsistent or varying adjudications with regard to individual members of each class that would establish incompatible standards of conduct for Defendants.

50.     The maintenance of a class action is the superior means of disposing of the common questions which predominate herein.

### COUNT ONE

**Violation of Fair Labor Standards Act ("FLSA")**
**(Collective Action)**

51.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

52.     Defendants are "employers" covered by the minimum wage and overtime requirements set forth in the Fair Labor Standards Act ("FLSA").

53.     As employees for Defendants, Plaintiff and other Class members have worked hours in which they were not paid minimum wage.

54.     As employees for Defendants, Plaintiff and the Class have worked in excess of the maximum weekly hours permitted under the FLSA, but were not paid overtime for those excess hours.

55.     Plaintiff and the Class do not qualify for any exemption from the minimum wage and overtime obligations imposed by the FLSA.

56.     Throughout Plaintiff's and the Class members' employment, Defendants have known that Plaintiff and the Class were employees – not independent contracts – and have known that Plaintiff and the Class are not exempt from the wage and overtime obligations imposed by the FLSA.  Defendants have known that it is required to pay Plaintiff and the Class

13

a minimum wage for all hours worked. Defendants also have also known that it is required to pay overtime wages at the rate of time and a half to Plaintiff and the Class for hours worked over 40 in any week. In spite of such knowledge, Defendants willfully have withheld and failed to pay the wages and overtime compensation to which Plaintiff and the other members of the Class are entitled.

57.     Pursuant to the FLSA, Plaintiff and the Class are entitled to at least minimum wage for all hours worked and for unpaid overtime at a rate of one and one half times their hourly wage. Because the Defendants' failure to pay such wages was willful pursuant to 28 U.S.C. § 255(a), Plaintiff and the Class are entitled to these wages dating back three years.

58.     The identity of all Class members is unknown at this time, but is known to Defendants, and is set forth in Defendants' records. Plaintiff is entitled to review these records and identify the other members of the Class who have a right to be provided with notice and an opportunity to join this collective action.

59.     The exact amount of compensation, including overtime compensation that Defendants have failed to pay the Plaintiff and the Class is unknown at this time, as many of the records necessary to make such precise calculations are in the possession of Defendants, or were not kept by Defendants.

60.     The FLSA requires employers to make, keep, and preserve records of the wages, hours, and other conditions and practices of employment, and to preserve such records. Plaintiff and the Class are entitled to review their records of hours worked to determine the exact amount of overtime and minimum wages owed by Defendants. Absent Defendants keeping these records as required by law, Plaintiff and the Class are entitled to submit their information about the number of hours worked.

61.     Defendants' failure to pay Plaintiff and the other Class members compensation in accordance with the minimum wage provisions and/or at the lawful overtime rates is not based on

14

good faith or reasonable grounds, or a belief that such failure is not in violation of the FLSA. Therefore, pursuant to 29 U.S.C. § 216(b), Plaintiff is entitled to liquidated damages in an amount equal to the compensation and/or overtime which they have not been paid.

62.     Plaintiff has been required to file this action as the result of Defendants' actions in failing to pay proper compensation.  As such, Plaintiff is entitled to attorneys' fees and costs incurred pursuant to 28 U.S.C. § 216(b).

## COUNT TWO
### Violation of the New York Labor Law Minimum
### Wage and Overtime Provisions
### (Class Action)

63.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

64.     Defendants are employers covered by the New York Labor Law.

65.     As employees for Defendants, Plaintiff and the other members of the Class were not paid minimum wage for all hours worked and were not paid at a rate of time and a half for all hours worked in excess of forty hours per week.

66.     Plaintiffs and the Class do not qualify for any exemption from the wage and overtime requirements of the New York Labor Law.

67.     The exact amount of compensation, including overtime compensation that Defendants have failed to pay the Plaintiff and the putative class members is unknown at this time, as many of the records necessary to make such precise calculations are in the possession of Defendants, or were not kept by Defendants.

68.     The New York Labor Law requires employers to make, keep, and preserve records of the wages, hours, and other conditions and practices of employment, and to preserve such records. Plaintiff is entitled to review their records of hours worked to determine the exact

amount of overtime wages owed by Defendants. Absent Defendants keeping these records as required by law, Plaintiffs are entitled to submit their information about the number of hours worked.

69.     Defendants' failure to pay minimum wage and overtime was willful within the meaning of N.Y. Labor Law § 663 and supporting regulations of the New York State Department of Labor.

70.     As a result of Defendants' willful and unlawful conduct, Plaintiff is entitled to an award of damages in an amount to be determined at trial, plus liquidated damages.

**COUNT THREE**

**VIOLATION OF THE NEW YORK LABOR LAW**

**<u>Failure to Pay For Each Hour Worked and Spread of Hours</u>**

71.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

72.     Defendants' knowing and deliberate acts are in direct contravention of N.Y. Labor Law § 191(1)(a) and are actionable under N.Y. Labor Law § 198.

73.     Defendants' failure to pay Plaintiff and other Class members for each hour worked, and failure to pay wages weekly and not later than seven calendar days after the week in which the wages were earned, was willful within the meaning of N.Y. Lab. Law § 198.

74.     Defendants also failed to pay Plaintiff and other members of the Class an extra hour of pay at the minimum wage for each day that they worked in excess of ten hours in violation of New York Labor Law.

75.     As a result of Defendants' willful and unlawful conduct, Plaintiff and the Class are entitled to an award of damages in an amount to be determined at trial, plus liquidated damages.

16

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

a      a declaration that Defendants' conduct is in violation of the Federal and New York State labor laws;

b.      compensatory damages, including minimum wage and overtime pay;

c.      liquidated and punitive damages;

d.      certification of a Class on behalf of the New York workers under the New York Labor Law;

e.      pre-judgment interest;

f.      attorneys' fees and costs;

g.      a right to trial by jury on those claims where jury trial is permitted; and

h.      any such further relief as may be just and proper.

Plaintiff demands a trial by jury as to all claims so triable.

Dated:   March 17, 2015
       New York, New York

GISKAN SOLOTAROFF

ANDERSON & STEWART LLP

*Catherine E Anderson*

Catherine E. Anderson
canderson@gslawny.com
11 Broadway, Suite 2150
New York, New York 10004
(212) 847-8315

*Counsel for Plaintiff and the Class*

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

------------------------------------------------------
                                          :
DAVINA HURT, ET AL.,                      :     CASE NO. 1:12-CV-00758
                                          :
          Plaintiffs,                     :
                                          :
v.                                        :     OPINION & ORDER
                                          :     [Resolving Doc. 810]
COMMERCE ENERGY, INC., ET AL.,            :
                                          :
          Defendants.                     :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

        This is a case about minimum wage and overtime pay under the Fair Labor Standards Act

("FLSA")[1] and overtime pay under the Ohio Minimum Fair Wage Standards Act ("Ohio Wage

Act").[2] Plaintiffs are door-to-door workers who solicited residential customers for the Defendants'

energy services.

        Following a trial on the merits, a jury found Defendants liable for violations of the FLSA and

the Ohio Wage Act.[3]  Defendants now renew the motion for judgment as a matter of law they made

at trial.  In the alternative, Defendants move for a new trial, or to certify an interlocutory appeal of

the liability phase of the trial.  For the following reasons, the Court **DENIES** the motion for

judgment as a matter of law, **DENIES** the motion for a new trial, and **DENIES** the motion to certify

an interlocutory appeal.

### I. Background

        The Court has previously issued an opinion detailing the factual background of this case and

---

[1] 29 U.S.C. § 201 *et seq.*

[2] Ohio Rev. Code § 4111.01 *et seq.*

[3] *See* Doc. 808.  Throughout this opinion, citations to the draft trial transcript will be abbreviated as "Tr. [date]
at [page]:[line]."

Case No. 1:12-CV-00758
Gwin, J.

incorporates that background by reference.[4] In short, Defendants sell electricity and natural gas to

residential and commercial customers in the United States and Canada. Under Defendant's selling

scheme, Plaintiffs would go door to door to obtain applications from potential customers. An

application could then become final contract after a verification call between the customer and a

third-party verifier and after the Defendant found the customer's credit satisfactory. Plaintiffs were

paid commission for every finalized contract; if an application was rejected for any reason before

the contract became final, the employee would not be paid.

Plaintiffs brought suit, alleging this commission-based compensation system deprived them

of minimum wage and overtime. Two classes were certified: a nationwide FLSA collective action

seeking minimum wage and overtime under federal law, and a Rule 23 class action seeking overtime

under Ohio law. Against these claims, Defendants argued that Plaintiffs were exempt from overtime

and minimum wage requirements because of the "outside salesperson" exemption.

The Court held a trial on Defendants' liability from September 29, 2014, to October 6, 2014.[5]

At the close of Plaintiffs' case, Defendants moved for judgment as a matter of law[6] on two

grounds. First, Defendants argued that the Ohio "Badge Never Used" ("BNU") group of

employees—those who attended at least one day of training but never obtained a completed

application from a customer—had not established that any member of the group had worked more

---

[4] *See* Doc. 89 at 1–6.

[5] The Court bifurcated the proceedings into a liability phase and a damages phase. Doc. 731.

[6] Defendants styled these oral motion as seeking "directed verdicts." The terminology of the Federal Rules of Civil Procedure regarding "directed verdict" and "judgment notwithstanding the verdict" (also called "j.n.o.v.") was updated in 1991 so that all such motions are now simply called "judgment as a matter of law." *See* 9B Wright & Miller, Federal Practice & Procedure Civil § 2521, at nn. 7, 13–19 & accompanying text (3d ed. 2014) (citing Fed. R. Civ. P. 50(a) Advisory Committee Note to 1991 Amendments).

Case No. 1:12-CV-00758
Gwin, J.

than forty hours in a week, and thus had failed to prove their claim for overtime wages.[7] Second, Defendants argued that Plaintiffs' evidence established that Plaintiffs were exempt outside salespeople.[8] The Court denied both motions, finding there was sufficient evidence for both issues to go to the jury.

At the close of Defendants' case, Defendants and Plaintiffs cross-moved for judgment as a matter of law regarding the application of the outside salesperson exemption.[9] The Court denied both motions.

Defendants also raised several objections to the jury instructions. Relevant to this motion, they argued that the Court erred in instructing the jury that it could consider whether the applications obtained by Plaintiffs were binding commitments in deciding whether the transactions were "sales" for purposes of the FLSA.[10]

Finally, Defendants also object to the Court twice instructing the jury during the trial that an employment contract cannot waive FLSA minimum wage and overtime requirements if those requirements would otherwise apply.[11]

## II. Judgment as a Matter of Law

Defendants renew their motion for judgment as a matter of law. They raise three issues, which will be addressed in turn. First, that there was insufficient evidence that the Plaintiffs qualified for the outside salesperson exemption. Second, that no evidence supports the inference that any BNU group member worked more than 40 hours in any week. And third, that the Court's

---

[7] Tr. 10/1/2014 at 183:24–185:23.

[8] *Id.* at 186:6–186:19.

[9] Tr. 10/6/2014 at 21:10–21:20.

[10] Doc. 804 at 3–7; Tr. 10/2/2014 at 165:25–167:5; Tr. 10/6/2014 at 7:23–9:25.

[11] Doc. 810-1 at 5–6.

Case No. 1:12-CV-00758
Gwin, J.

instruction to the jury that the minimum wage requirements of the FLSA cannot be waived prejudiced their case. All three arguments lose.

Before moving on to the merits of this motion, the Court pauses to chastise both sides for their complete and utter failure to cite to the trial record or admitted exhibits in their briefing.[12] Judge Easterbrook once wrote, regarding summary judgment, that, "[d]istrict judges are not archaeologists. They need not excavate masses of papers in search of revealing tidbits—not only because the rules of procedure place the burden on litigants, but also because their time is scarce."[13] The same goes for post-trial motions. When the issues all relate to what happened at trial, the parties should point to specific evidence that appears *in the record* to support their positions, rather than relying on generalized statements and their own (occasionally faulty) memories as they did here. In the future, both parties and their counsel would do well to respect the Court's limited resources and not force it to do their jobs for them.

### A. Legal Standard

A motion for judgment as a matter of law under Rule 50(a) requires the trial court to decide "whether there was sufficient evidence presented to raise a material issue of fact for the jury."[14] The Court "must view the evidence in the light most favorable to the party against whom the motion is made, and give that party the benefit of all reasonable inferences."[15] "'[S]ufficient evidence' will be found unless, when viewed in the light of those inferences most favorable to the nonmovant, there is either a complete absence of proof on the issues or no controverted issues of fact upon which

---

[12] In fact, the Court has learned from the court reporter that neither side has ever even bothered to obtain a transcript of the trial, other than of counsel's opening statements.

[13] *Nw. Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662–63 (7th Cir. 1994).

[14] *Monette v. AM-7-7 Baking Co.*, 929 F.2d 276, 280 (6th Cir. 1991).

[15] *Wayne v. Village of Sebring*, 36 F.3d 517, 525 (6th Cir. 1994).

Case No. 1:12-CV-00758
Gwin, J.

reasonable persons could differ."[16]  The Court neither weighs the evidence, evaluates the credibility

of the witnesses, nor substitutes its judgment for that of the jury.[17]

## B. Analysis

### 1. Outside Sales Exemption

Defendants first argue that they should receive judgment as a matter of law because

Defendants established, and Plaintiffs failed to rebut, that Plaintiffs meet the definition of outside

salespeople.[18]  While Defendants' motion largely objects to the contents of the jury instructions

themselves, which is discussed in more detail below, Defendants also raise arguments regarding the

sufficiency of the evidence that are properly considered on motion for judgment as a matter of law.[19]

Generally, the FLSA requires employers to pay employees a minimum wage, as well as time-

and-a-half overtime pay when the employee works more than forty hours in a week.[20]  Not all

employees, however, are protected by this requirement.  One exception is that "any employee

employed . . . in the capacity of outside salesman" is not entitled to minimum wage or overtime.[21]

An outside salesperson is "any employee . . . whose primary duty is . . . making sales . . . and . . . who

is customarily and regularly engaged away from the employer's place or places of business in

---

[16]*Monette*, 929 F.2d at 280; *see also* Barnes v. City of Cincinnati, 401 F.3d 729, 736 (6th Cir. 2005) ("Judgment as a matter of law may only be granted if . . . there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party.").

[17]*Wayne*, 36 F.3d at 525.

[18]Doc. 810-1 at 2–4.

[19]An incorrect jury instruction can provide the basis for a motion for judgment as a matter of law when a pure legal issue is dispositive as to the outcome of the case. *See, e.g.,* Kladis v. Brezek, 823 F.2d 1014, 1017 (7th Cir. 1987); *accord* Libbey-Owens-Ford Co. v. Ins. Co. of N. Am., 9 F.3d 422, 426 (6th Cir. 1993).  As the Court will explain, however, the evidence was sufficient for the jury to have found in favor of Plaintiffs on this issue regardless of whether the disputed instruction was included.  Thus, it is unnecessary to resolve the correctness of the jury instructions at this point, and the Court instead reserves that discussion for its opinion on the motion for a new trial.

[20]*See* 29 U.S.C. §§ 206, 207.

[21]29 U.S.C. § 213(a)(1).

-5-

Case No. 1:12-CV-00758
Gwin, J.

performing such primary duty."[22] A "sale," in turn, is defined as "any sale, exchange, contract to

sell, consignment for sale, shipment for sale, or other disposition."[23] This "include[s] the transfer

of title to tangible property . . . ."[24] The parties stipulated that Plaintiffs in this case were customarily

and regularly engaged away from the employer's place of business.[25] This left for trial only the

question of whether Plaintiffs had the primary duty of making sales.

Defendants say they "presented evidence that showed Plaintiffs were engaged to make sales

as defined by the statutes and regulations."[26] But there was still sufficient evidence for the jury to

reach the opposite conclusion, even without the disputed instruction regarding the door-to-door

workers' ability to enter into a binding contract with a customer. When considering whether

Plaintiffs bore the "external indicia" of outside salespeople—a list of non-exhaustive factors that the

jury could consider as part of the totality of the circumstances—the evidence could easily support the

jury's verdict.[27]

Much of the evidence suggested that Plaintiffs were not actually outside salespeople.

Plaintiffs were hired without regard to their prior sales experience.[28] Plaintiffs also presented

evidence that Defendants closely controlled the work schedules and locations of the vast majority of

---

[22] 29 C.F.R. § 541.500.

[23] 29 U.S.C. § 203(k).

[24] 29 C.F.R. § 541.501(b). The parties stipulated that the natural gas and electricity sold by Defendants are tangible property. *See* Doc. 818-1 at 14.

[25] Doc. 763 at 4.

[26] Doc. 810-1 at 2.

[27] *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2172–73 (2012); *see also* Doc. 89 at 11–18 (evaluating these indicia in ruling on a motion for summary judgment).

[28] *E.g.*, Tr. 9/29/2014 at 113:1–113:4 ("Q. The company doesn't require that the plaintiffs have any previous sales experience before being hired into these positions, correct? A. That would be correct."); Tr. 10/1/2014 at 149:2–149:19 ("Q. Am I correct that these workers who go door-to-door are hired off the street and there's no requirement whatsoever of any prior skill [to] get this job? A. Yes. . . . Q. They're not required to have ever worked doing any sales, correct? A. Correct."); *cf., e.g., Christopher*, 132 S. Ct. at 2176 ("Petitioners were hired for their sales experience.").

-6-

Case No. 1:12-CV-00758
Gwin, J.

their door-to-door workers.[29] Witnesses testified that workers would be driven to residential

neighborhoods by supervisors,[30] told which blocks to canvas,[31] and told how many doors to knock

on per day.[32] Many workers did not control their own schedules—once a group of door-to-door

workers was taken to the field by a supervisor, they were limited in when they could take breaks[33]

and had to keep working until the supervisor collected them at the end of the day.[34] And while

---

[29] *See, e.g., Nielsen v. DeVry, Inc.*, 302 F. Supp. 2d 747, 756 (W.D. Mich. 2003).

[30] *E.g.*, Tr. 9/30/2014 at 130:13–131:4 ("Q. So they would put you in a team, and then what happened? A. Then we got into the van. . . . Q. And did you go out to the neighborhoods at that point? A. Yes. Q. Who decided which neighborhoods you were going to go to? A. The crew leader."); *id.* at 203:12–204:10, 237:18–239:23 (descriptions from crew leaders regarding their responsibilities, including driving door-to-door workers to the field); *id.* at 243:9–243:13 ("Q. Were [sic] there anybody who drove themselves out to the field? A. I can only thin[k] of one person who had a second job, but no, everyone was required to go with the crew leader crew coordinator in the one car."); Tr. 10/1/2014 at 40:2–40:22 (crew coordinator stating that he would "drop [the door-to-door workers] off on their streets and basically pick them up at 9:00 when we were done . . . .").

[31] *E.g.*, Tr. 9/30/2014 at 67:5–67:17 ("Q. And explain what a street sheet is? A. A street sheet is just like a sheet that shows which doors you knocked on."); *id.* at 131:2–131:25 ("Q. Then once you got to the neighborhood did you get to choose which streets you worked on? A. No. . . . Q. Did they tell you what streets you were supposed to work on? A. Yes. Q. Did you ever work on a street that you were not supposed to? A. Yes. Q. And what happened? A. I got in trouble."); *id.* at 204:11–204:24 ("[i]t was the crew coordinator who generally picked the area."); Tr. 10/1/2014 at 40:2–40:22 (crew coordinator would assemble materials for workers, including "contracts, street sheets, maps, and assigned areas for all the people to position on their streets").

[32] *E.g.*, Tr. 9/30/2014 at 66:23–67:4 ("Q. Once you got to the neighborhood where you be knocking on [doors], what were your instructions from the company? A. To [knock] on at least a hundred doors regardless if you got a deal or not . . . ."); *id.* at 132:1–132:9 ("Q. How many houses would you go to in a typical day? A. Anywhere between 150 and 200. Q. Did anybody at Just Energy tell you you had to go to a certain number of houses per day? A. Yes."); *id.* at 243:14–245:21("Q. Did you have a quota for the number of doors you had to knock on? A. Yes. . . . Q. You were supposed to knock on 50 doors an hour? A. Uh-huh. Yes."); Tr. 10/1/2014 at 15:7–16:3 (describing office manager calling door-to-door worker, saying "He wanted me to knock faster because I'm a slow walker and if I don't get deals he would assume I wasn't walking fast enough, and he wanted 200 doors a day"); *id.* at 44:16–44:18 ("Q. How many houses would you typically go to during a day? A. Basically we were told to do roughly between 100 to 200 doors every single day.").

[33] *E.g.*, Tr. 9/30/2014 at 67:22–68:9 ("Q. Could you leave on your own if you wanted to? A. No. Q. What about breaks? Could you take breaks? A. When they told us it was time to, yes."); Tr. 10/1/2014 at 14:12–15:3 ("Q. Was there a policy about breaks when you were out knocking door-to-door? A. .Yes, there was. Q. And what was that policy? A. Dennis said no breaks. He said, take a break when you get a deal at the—we were allowed to go in the customer['s] house, but he would say if the customer invites you in that's your chance to use their bathroom and ask for some water. So that was my break.").

[34] *E.g.*, Tr. 9/30/2014 at 67:18–67:23 ("Q. How long would you stay in the neighborhoods as a general proposition? A. From the time we get there, maybe 10:00, 11:00 from whenever the crew coordinator comes and picks us up. Q. Could you leave on your own if you wanted to? A. No."); *id.* at 132:24–133:3 ("Q. Did you get to decide when you were done knocking on doors for the day? A. No. Q. Who decided that? The team leader . . . ."); *id.* at 203:12–204:24 (crew coordinator describing setting daily schedules); *id.* 237:18–239:23 (crew coordinator would pick up his workers at 8:00 or 9:00 each evening); Tr. 10/1/2014 at 12:25–13:3 ("Q. What happened after you were done (continued...)

Case No. 1:12-CV-00758
Gwin, J.

working in the field, Plaintiffs were required to wear clothing or a pin bearing Defendants' brand name.[35/]

Some of the external indicia pointed the other way as well. Notably, Plaintiffs acknowledge that they were paid on a commission basis, a factor that supports Defendant's argument that Plaintiffs were outside salespeople.[36/]

In the end, though, most indicia could have supported a verdict for either party. Plaintiffs were given detailed scripts to follow when making a pitch to a potential customer, and practiced those scripts at length.[37/] While the jury could also have counted this in Defendants' favor as

---

[34/](...continued)
knocking around 9:00? A. I would wait for the van leader to figure out where I was and come pick me up.").

[35/]E.g., Tr. 9/29/2014 at 164:14–165:4 (reading clothing regulations from orientation manual (Joint Exhibit 9B)); Tr. 9/30/2014 at 79:5–79:25 ("Q. Were you required to wear any particular type of clothing? A. Yes. Q. What were you required to wear? . . . . A. I was required to wear the polo shirt with the Just Energy logo on it, jackets if needed—well, if it was cold outside you couldn't wear your own coat, you had to wear this, something with the Just Energy logo on it. Hats, badge. That was all part of the uniform."); id. at 117:8–117:16 ("Q. Did you have a Just Energy uniform? A. Yes. I had the polo shirt. . . . Q. Did you have any other Just Energy clothing or attire? A. No, just my ID and a pin. That's about it."); id. at 140:7–141:1 ("Q. Did Just Energy require you to wear certain clothing when you were out in the field? A. Yes. Q. And what kind of clothing was that? A. A shirt. I had a very heavy jacket, it was November."); id. at 184:4–185:23 ("Q. What did you wear in the field? A. I had to wear [all their] clothing, khaki pants, nice shoes, and there was always the . . . button up shirt. The baseball hat. I also had a knitted hay. There was a wind breaker coat and a lanyard with your ID on it, as well."); Tr. 10/1/2014 at 16:9–16:24 ("Q. Did you have to wear certain clothing to go out and go door-to-door? A. Yes. Q. And what was that? A. I had to wear a Just Energy hat, my Just Energy badge, my Just Energy shirt, dark pants or khakis, [cargo] shorts maybe, and some decent shoes, comfortable to walk in, but professional, and when it got cold I had to purchase a Just Energy skully and a Just Energy fleece.").

[36/]See, e.g., Christopher, 132 S. Ct. at 2173 (discussing "incentive compensation"); Doc. 818-1 at 5 (parties stipulated that "Plaintiffs are compensated on a commission basis and [Defendants] do not pay overtime for hours worked over 40 hours per week and do not pay minimum wage in situations where the commission earned during a particular workweek are insufficient to ensure that salespersons' wage rates meet or exceed the minimum wage.").

[37/]E.g., Tr. 9/29/2014 at 169:22–170:2 ("Q. There's actually scripts that the company puts together for the plaintiffs on—to walk through all of this stuff with the homeowner, correct? A. Yeah, to provide—it's a guideline, script, but the key points that the salesperson must touch upon when transacting in that sale."); 177:18–188:10 (reading the script regarding "objection handling" (Joint Exhibit 11)); Tr. 9/30/2014 at 11:3–12:12 ("Q. Can you walk us through the steps you would follow on a typical homeowner interaction? A. We would knock on the door. As soon as someone came to the door we would look at our scripts, see what it was we needed to do and say, when we needed to make eye contact, when we had to break eye contact, the way we need to stand, things of that sort. Q. Okay. And again, were those things that you practiced in the morning meetings, as well? A. Yes. Those are the things we practiced daily. Q. And who would have given you instruction that you had to follow the scripts? A. Whoever was in charge of the office, a regional manager, store manager, or crew coordinator."); id. at 62:5–62:9 ("Q. And what were you told about those sale scripts? A. That it was verbatim that we follow the script."); id. at 68:19–69:23 (describing interactions with homeowners
(continued...)

-8-

Case No. 1:12-CV-00758
Gwin, J.

"specialized sales training" that would support application of the outside sales exemption,[38/] this

evidence somewhat points both ways, as it also indicates their task was not truly independent selling.

Similarly, Plaintiffs were, by the very nature of their jobs, required to solicit new customers, which

suggests they could have been outside salespeople.[39/] But on the other hand, Plaintiffs did not

independently generate their own leads or follow up on their sales, which suggests the opposite.[40/]

Instead, they would knock on the doors of the houses they were assigned to, and were prohibited

from returning once the initial and introductory interaction with the customer was complete.[41/]

Beyond evaluating these indicia, evidence that Plaintiffs obtained only non-binding

applications from customers also supports the jury's decision.[42/] Defendants assert that "it is not

---

[37/](...continued)

as dictated by the script; *id.* at 93:21–94:6 (describing being reprimanded for "not saying the script verbatim"); *id.* at 109:13–109:23 ("Q. Describe what those role playing exercises were like. A. We would read from the script. They wanted you to do everything on the scripte, and you had to read it precise."); *id.* at 134:7–134:21 (describing interactions with homeowners as dictated by the script); *id.* at 147:5–147:24 (recounting that some employees would go off-script when dealing with reluctant customers); *id.* at 170:1–172:4 (identifying that part of the reason for the scripts was to comply with regulations); Tr. 10/1/2014 at 16:25–17:21 (describing interactions with homeowners as dictated by the script); *id.* at 156:2–156:7 ("Q. How did you know what to say at the door? A. They gave us a script to say that we were supposed to follow."); *id.* at 166:7–166:13 (describing orientation process that included group practice "going over the script"); *id.* at 201:16–202:11 ("Q. Do you expect them to follow sales scripts when they make presentations to customers? A. Yeah. We—part of the training process is they do have a presentation script that has been approved that they usually should follow in the very begin[ning] stages just to give them a [guideline] of the order of what to say."); Tr. 10/2/2014 at 11:11–12:6 (office manager expected salespeople to use the script "as a guideline" and eventually commit it to memory); *id.* at 79:4–79:5 ("Q. You follow the sales script verbatim, correct? A. Yes, sir.").

[38/]*See, e.g., Nielsen,* 302 F. Supp. 2d at 757.

[39/]*See Nielsen,* 302 F. Supp. 2d at 758.

[40/]*See id.*

[41/]*E.g.,* Tr. 9/29/2014 at 194:2–194:17 ("Q. And in fact the plaintiffs don't return they're not allwoed to return to the home after they've handed off that phone. A. If—absolutely that's correct. Q. They're done dealing with the homeowner at that point. A. Absolutely. Yes."); Tr. 9/30/2014 at 14:2–14:7 ("Q. Once you left the home at that point did you have any further interaction with the customer? A. None whatsoever. Q. Okay. Did you ever personally follow up with a phone call or make another return visit, or anything of that sort? A. No."); *id.* at 72:8–72:15 ("Q. Once you leave once the phone is passed to the customer, do you ever return to the home? A. No. Q. Do you ever make any personal follow up with that customer? A. No. Q. For any purpose? A. No, not at all."); *id.* at 74:5–74:7 ("Q. While an application was pending were you permitted to return and speak to the homeowner for any reason? A. No, not at all.").

[42/]Defendants object that this is an improper factor for the jury to have considered. The Court addresses that objection below in Section III.B.1.

-9-

Case No. 1:12-CV-00758
Gwin, J.

disputed in the evidentiary record that binding agreements were signed by customers."[43] In fact, this point was very much disputed at trial. Evidence showed that Defendants retained "sole discretion" to accept or reject a customer's application.[44] The applications obtained by Plaintiffs were merely proposals until Defendants accepted them. This factor suggests that Plaintiffs were not actually making sales.[45]

Further, this situation is unlike the hypothetical the Supreme Court offered in *Christopher* of "a manufacturer's representative who takes an order from a retailer but then transfers the order to a jobber's employee to be filled."[46] The Supreme Court said that, in such a situation, it would be the manufacturer's representative, not the jobber, who had made the sale.[47] Here, by contrast, Defendants were not just filling orders obtained by Plaintiffs. Rather, after receiving a completed application, Defendants still had to determine whether or not to accept it. This is far more of an active role in completing the sale than the straightforward task of fulfilling an otherwise finalized order.

In short, there was sufficient evidence for the jury to have found either way on the outside sales exemption. Thus, Defendants' motion for judgment as a matter of law on this issue loses.

### 2. BNU Claims

Defendants' second ground in moving for judgment as a matter of law pertains to one

---

[43]Doc. 810-1 at 3.

[44]Tr. 9/29/2014 at 187:11–190:5 (reviewing terms and conditions of contract signed by customers (Joint Exhibit 24)); Tr. 9/30/2014 at 42:1–43:6 (same); Tr. 10/1/2014 at 74:11–75:24 (reviewing terms of Plaintiffs' commission-based compensation agreements, which acknowledge Defendants' "unfettered discretion to reject any energy contract submitted" (Plaintiffs Exhibit 6)); *id.* at 128:14–129:22 (reviewing terms of agreement with customer, which "is conditional upon acceptance by [Defendants]." (Joint Exhibit 15)); *see also* Doc. 89 at 10–11.

[45]*See infra* Section III.B.1.

[46]*Christopher*, 132 S. Ct. at 2173–74.

[47]*Id.*

-10-

Case No. 1:12-CV-00758
Gwin, J.

particular group: BNUs (i.e., those employees who attended at least one day of training, but never

received a completed application from a customer) who have claims for overtime wages as part of

the Rule 23 class.[48/] Defendants argue that there is no evidence that anyone from this group worked

more than 40 hours in a week, and thus that Plaintiffs failed to prove their case that the BNUs are

entitled to overtime wages under Ohio law.[49/]

Defendants made this motion at trial, and the Court denied it.[50/] Then, as now, there was

some evidence from which the jury could infer that some members of this group worked enough days

to have racked up 40 hours or more in a week.[51/] There was certainly evidence from which the jury

could have reached the opposite conclusion as well.[52/] But either conclusion was reasonable.

Furthermore, the Court has not certified a sub-class of BNUs. Plaintiffs presented sufficient

evidence to prove liability on a classwide basis—namely, that Defendants did not pay their door-to-

door workers minimum wage or overtime and that Plaintiffs were not exempt outside salespeople.

From the time the class was certified, the Court has recognized that while liability can be determined

on a classwide basis in this case, damages will more likely need to be done on an individualized

basis.[53/] Some members of the liability class will likely be unable to establish that they worked

enough hours to qualify for overtime. Defendants will have ample opportunities to challenge the

---

[48/]Doc. 810-1 at 4–5.

[49/]Id.. Similar to the FLSA, Ohio law requires employers to pay employees time-and-a-half pay for all hours worked in excess of forty per week. See Ohio Rev. Code § 4111.03.

[50/]Tr. 10/1/2014 at 183:24–186:2.

[51/]See Tr. 9/29/2014 at 119:19–121:16 ("Q. Are you aware that there are individuals who worked weeks without earning any commissions? . . . A. There might be a few."); Tr. 10/1/2014 at 127:24–128:12 ("Q. How long would [BNUs] typically work? A. Well, they tried to make it through that first wave, right, so anywhere from one to three weeks.").

[52/]See Tr. 10/2/2014 at 111:23–112:6 (Q. So have you ever observed people come in for a day of orientation and never come back? A. Yes. A lot. . . . Q. And have you ever seen people go out to the field for just a day and never come back? A. Oh, yeah, all the time.").

[53/]See Doc. 88; Doc. 719 at 7.

-11-

Case No. 1:12-CV-00758
Gwin, J.

individual damages claims of BNUs during the damages phase.

Defendants recognize as much, but argue that because the parties' damages experts considered the BNUs to be a distinct group separate from the rest of the class, the Court should treat them separately and order judgment against them.[54] Defendants' reliance on the damages experts' opinions, however, only supports Plaintiffs' position that sub-class certification is an issue for the damages phase of this case, not the liability phase.

### 3. Prejudice

Defendants also request judgment as a matter of law because the Court instructed the jury that employees cannot waive their rights under the FLSA.[55] The merits of this argument are discussed below as they relate to Defendants' motion for a new trial. For the purposes of Defendants' motion for judgment as a matter of law, it is sufficient to note that Defendants never based their Rule 50(a) motions at trial on this ground.[56] A Rule 50(b) motion for judgment as a matter of law merely renews a prior motion, and thus "can be granted only on grounds advanced in the preverdict [Rule 50(a)] motion."[57] To the extent this argument is even cognizable as part of a Rule 50 motion—which is doubtful, as it does not involve any questions that the jury could have resolved—Defendants have forfeited it.

### III. New Trial

In the alternative to judgment as a matter of law, Defendants move for a new trial on two grounds. First, that the jury instructions erred by including language about the authority of a

---

[54] Doc. 818 at 9.

[55] Doc. 810-1 at 5–6.

[56] See Tr. 10/1/2014 at 183:20–186:20 and Tr. 10/6/2014 at 19:18–22:5 for Defendants' other grounds in moving for judgment as a matter of law.

[57] Fed. R. Civ. P. 50(b) Advisory Committee Note to 2006 Amendment.

Case No. 1:12-CV-00758
Gwin, J.

salesperson to create a binding contract. And second, that the Court erred by instructing the jury that

the minimum wage and overtime requirements of the FLSA cannot be waived. Both arguments lose.

### A. Legal Standard

Under Federal Rule of Civil Procedure 59(a), "[a] new trial may be granted . . . in an action

in which there has been a trial by jury, for any of the reasons for which new trials have heretofore

been granted in actions at law in the courts of the United States."

> Generally courts have interpreted this language to mean that a new trial is warranted
> when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict
> being against the weight of the evidence; (2) the damages being excessive; or (3) the
> trial being unfair to the moving party in some fashion, i.e., the proceedings being
> influenced by prejudice or bias.[58]

### B. Analysis

### 1. Binding Sales and State Regulations

Defendants' primary objection in this motion is that the jury instructions regarding what

constitutes a "sale" for purposes of the FLSA were incorrect.[59] Jury instructions must "adequately

inform the jury of relevant considerations and provide a basis in law for aiding the jury to reach its

decision."[60] Jury instructions that, when "viewed as a whole, were confusing, misleading, or

prejudicial" require a new trial.[61] But mere error in the jury instructions does not itself require a new

trial if the error is harmless.[62]

At the close of the trial, the Court instructed the jury that Plaintiffs would be exempt outside

---

[58] *Holmes v. City of Massillon*, 78 F. 3d 1041, 1045–46 (6th Cir. 1996).

[59] *See* Doc. 818-1 at 14–15.

[60] *King v. Ford Motor Co.*, 209 F.3d 886, 897 (6th Cir. 2000) (quoting *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 166 (6th Cir. 1993)) (internal quotation marks omitted).

[61] *See Benaugh v. Ohio Civil Rights Comm'n*, 278 F. App'x 501, 513–14 (6th Cir. 2008).

[62] *Troyer v. T.John.E. Prods., Inc.*, 526 F. App'x 522, 525 (6th Cir. 2013) (citing *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 822 (6th Cir. 2000)).

-13-

Case No. 1:12-CV-00758
Gwin, J.

salespeople if they had a primary duty of making sales. The Court explained:

> Within the meaning of the Fair Labor Standards Act, "sale" or "sell" includes an "sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition," as well as "the transfer of title to tangible property." In this case, both parties agree that natural gas and electricity are tangible property. Your decision should be a functional, rather than formal, inquiry, one that views an employee's responsibilities in the context of the particular industry in which the employee works.

> In determining whether a particular transaction qualifies as a sale for purposes of the Fair Labor Standards Act, you are required to consider the extent to which the employee has the authority to bind the company to the transaction at issue. However, when governmental regulatory requirements limit an employee's ability to bind his employer, compliance with those governmental regulatory requirements do not disqualify the transaction from constituting a sale for purposes of the outside salesperson exemption.

> The various laws of the states where Plaintiffs worked, among other things, require retail electric and gas services establish reasonable and non-discriminatory creditworthiness standards and allows retail electric and gas services to require a deposit or other reasonable demonstration of creditworthiness from a customer as a condition of providing service. However, none of the laws of any of these states require retail electric and/or gas services to conduct a credit check.

> On the other hand, if the employer retains and/or exercises discretion to accept and/or reject any transaction for reasons that are unrelated to regulatory requirements applicable to the industry, the transaction should not be considered a sale for purposes of the Fair Labor Standards Act.

> You may, but are not required to, also consider certain factors or indicia that tend to suggest that Plaintiffs were primarily engaged in making sales. The touchstone for making a sale is obtaining and giving a commitment to provide the gas or electricity. No single one of these factors is dispositive, nor is this an exhaustive list of factors you may consider. You should look at these, or other, factors together and ask whether, under the totality of the circumstances, they suggest Plaintiffs were actually engaged in making sales.

> Factors you may consider include:
> (1) The extent to which the job was advertised as a sales position and the employee was recruited based on sales experience and abilities .
> (2) The extent to which the employee received specialized sales training.
> (3) The extent to which the employee is compensated based wholly or in significant part on commissions.
> (4) The extent to which the employee has the responsibility of independently soliciting new business.
> (5) The extent to which the employee is directly supervised in carrying our his or

-14-

Case No. 1:12-CV-00758
Gwin, J.

> her job duties.
>
> (6)    Other factors that have been discussed in this case as circumstantial evidence
> that the employees were or were not engaged in making sales.[63]

Specifically, Defendants say the Court erred in telling the jury that, when deciding whether

Plaintiffs were making "sales," the jury should consider the extent of the employee's ability to bind

the company to the transaction and whether any government regulations prohibited the employee

from making a final sale.[64]  Defendants also say the Court's summary of Ohio law was incorrect,

because they view the regulations as requiring credit checks of potential customers before finalizing

contracts.[65]

In its summary judgment opinion, the Court explained in detail that the non-binding nature

of the applications Plaintiffs obtained from customers is relevant to whether Plaintiffs were making

sales within the meaning of the FLSA.[66] The Court also explained at trial its conclusion that Ohio

law does not require Defendants to do credit checks that would have prevented Plaintiffs from

obtaining binding contracts.[67]

In *Christopher v. SmithKline Beecham Corp.*, the Supreme Court found that pharmaceutical

representatives were exempt outside salespeople even though they did not actually accomplish

"sales" of drugs to patients.[68]  Because Congress meant to define sales broadly to "accommodate

---

[63]Doc. 818-1 at 14–16.

[64]*See* Doc. 810-1 at 2–4.

[65]Doc. 810-1 at 3; Doc. 818 at 8–9.  Defendants have not raised any objection to the Court's instructions with respect to the laws of other states at issue, and in their briefing at trial only directly addressed Ohio's regulations.  *See* Doc. 795.  Because Defendants have not objected to the Court's instructions on the basis of any other state's laws, the Court will consider only the Ohio regulations in this opinion.

[66]*See* Doc. 89 at 8–11.

[67]Tr. 10/2/2014 at 32:9–44:3.

[68]*Christopher*, 132 S. Ct. at 2159.

-15-

Case No. 1:12-CV-00758
Gwin, J.

industry-by-industry variations in methods of selling commodities,"[69] the Supreme Court said that courts should consider the impact of regulatory requirements as to whether certain transactions "are tantamount, in a particular industry, to a paradigmatic sale of a commodity."[70] Thus, because federal regulations prevented the pharmaceutical representatives from engaging in the actual sale of drugs to the patient, the Supreme Court found it was enough that the representatives "promoted" sales to doctors who in turn made "nonbinding commitments" to prescribe the drugs to their patients.[71]

Other courts that have considered situations where employees obtained only non-binding commitments have concluded that the employees were not necessarily making sales. In *Clements v. Serco*, the Tenth Circuit held that Army recruiters were not exempt outside salespeople in part because they lacked the authority to enlist a recruit; instead, they were merely "cultivat[ing] a list of persons who seemed receptive to the idea of joining the Army," and the Army retained discretion as to whether or not to actually accept the applicant.[72] Similarly, in *Wirtz v. Keystone Readers*, the Fifth Circuit held that "student salesmen" who "obtain[ed] orders" for magazine subscriptions by door-to-door solicitation were not making sales because, once again, they effectively only gathered lists of interested customers, and no contract became final until the employer verified the order and the customer's qualifications.[73] In *Burling v. Real Stone Source, LLC*, the District of Idaho concluded that even an employee who negotiated and drafted sales proposals with customers, as well as conducting other promotional activities designed to facilitate sales, was not making sales because the

---

[69] *Id.* at 2171.

[70] *Id.* at 2171-72.

[71] *Id.* at 2172.

[72] *Clements v. Serco, Inc.*, 530 F.3d 1224, 1225–28 (10th Cir. 2008) (internal quotation marks and citation omitted).

[73] *Wirtz v. Keystone Readers Serv., Inc.*, 418 F.2d 249, 259–61 (5th Cir. 1969).

Case No. 1:12-CV-00758
Gwin, J.

employer retained the final discretion to approve or reject any given proposal.[74] And unlike the situation in *Nielsen v. Devry, Inc.*, where the Western District of Michigan found that "field representatives" who guided applicants through the process of being admitted and matriculating to DeVry University were engaged in sales, the interactions between Plaintiffs and potential customers in this case ended before the transaction was "consummated," and Plaintiffs were prohibited from following up with customers to ensure the sales were completed.[75]

The distinguishing characteristic in *Christopher* was that the pharmaceutical representatives were legally prohibited from actually selling drugs to patients. Because of the regulatory scheme, the best the pharmaceutical representatives could do was to promote drugs to doctors, who would in turn prescribe them to patients. Thus, while making a sale for the purposes of the FLSA does not necessarily require a transfer of title, the alleged selling activity must be viewed in the context of the particular industry at issue—including whether the industry is subject to a "unique regulatory environment"—and the jury must determine whether within that particular industry, the employee has the job of making "arrangements that are tantamount . . . to a paradigmatic sale of a commodity."[76] Indeed, the Sixth Circuit has recently distinguished *Christopher* on just this issue, finding that *Christopher* is not necessarily controlling outside of a situation where obtaining only a "nonbinding commitment" is the result of a "unique regulatory environment."[77]

Unlike the pharmaceutical representatives in *Christopher*, the Plaintiffs in this case were not

---

[74] *Burling v. Real Stone Source, LLC*, No. CV-08-43-E-EJL, 2009 WL 1812785, at *3–7 (D. Idaho June 24, 2009).

[75] *See Neilsen*, 302 F. Supp. 2d at 754–60.

[76] *Christopher*, 132 S. Ct. at 2171–72; *see also id.* at 2172 n.23 ("[W]hen an entire industry is constrained by law or regulation from selling its products in the ordinary manner, an employee who functions in all relevant respects as an outside salesman should not be excluded from that category based on technicalities.").

[77] *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 583–84 (6th Cir. 2014).

-17-

Case No. 1:12-CV-00758
Gwin, J.

prohibited from completing a contract by state or federal regulations. Ohio law did not require

Defendants to retain unlimited rejection authority. Ohio regulations also do not *require* an energy

supplier to conduct a credit check, only for it to "establish reasonable and nondiscriminatory

creditworthiness standards."[78] By contrast, the energy supplier only "*may* require a deposit or other

reasonable demonstration of creditworthiness from a customer as a condition of providing service."[79]

The regulations contemplate that an energy supplier *could* require a satisfactory credit check before

initiating service, but is not *required* to do so. It could use some other method, such as accepting a

deposit.

The jury instructions on this point say nothing different. The Court explained to the jury that

state laws required Defendants to establish reasonable and non-discriminatory creditworthiness

standards, but that they did not require Defendants to conduct a credit check.[80] This instruction is

entirely consistent with the statutory language. It was then up to the jury to decide, based on the

evidence presented, how this regulatory environment impacted whether Plaintiffs were "making

sales."

The instructions did not require the jury to find for either side. The instructions merely listed

numerous factors that the jury could consider to decide whether Plaintiffs had the primary duty of

making sales, and among those factors were whether Plaintiffs obtained binding contracts and

whether any regulatory environment prevented them from doing so. The instructions also specified

other factors that the jury could consider in order to reach a conclusion based on the totality of the

---

[78] Ohio Admin. Code 4901:1-21-07; Ohio Admin. Code 4901:1-29-07.

[79] Ohio Admin. Code 4901:1-21-07; Ohio Admin. Code 4901:1-29-07 (emphasis added).

[80] Doc. 818-1 at 15.

-18-

Case No. 1:12-CV-00758
Gwin, J.

circumstances.[81] Given the relevant statutes, regulations, and case law, the jury instructions on these issues "adequately inform[ed] the jury of relevant considerations and provide[d] a basis in law for aiding the jury to reach its decision."[82]

## 2. Waiver of FLSA Rights

Defendants also request a new trial because the Court instructed the jury that employees cannot waive their rights under the FLSA.[83] "In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. . . ."[84] When counsel for either party makes an argument that is improper, the trial judge may step in to ensure the integrity of the proceedings.[85] However, conduct by a judge that shows "outright bias or belittling of counsel," or a trial that is "infected with the appearance of partiality" can require a new trial.[86]

The jury in this case was instructed at the close of trial:

> The right to receive minimum wage and overtime compensation under the [FLSA] cannot be waived. In other words, any agreement between a worker and his employer that the worker shall not be paid minimum wage or overtime is not enforceable if the worker is otherwise entitled to minimum wage or overtime under the law. However, if a worker is an exempt outside salesperson, that worker is not entitled to minimum wage and is not entitled to overtime compensation for hours worked in excess of forty hours.[87]

---

[81]/*Id.* at 15–16.

[82]/*King*, 209 F.3d at 897 (internal quotation marks omitted).

[83]/Doc. 818 at 10.

[84]/*Quercia v. United States*, 289 U.S. 466, 469 (1933).

[85]/*Cf., e.g., United States v. Young*, 470 U.S. 1, 7–10 (1985) (concluding that a trial judge has the responsibility to "maintain decorum" in a proceeding by "deal[ing] promptly" with counsel who make disparaging comments directed at opposing counsel).

[86]/*See Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 808 (6th Cir. 1999), *overruled on other grounds, Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (en banc).

[87]/Doc. 818-1 at 13 (citing *Beck v. City of Cleveland*, 390 F.3d 912, 923 (6th Cir. 2004)).

Case No. 1:12-CV-00758
Gwin, J.

Defendants admit that this is a correct statement of law.[88] They argue, however, that the Court prejudiced their case by giving the jury this instruction twice during trial as well as at the close.

The two times the Court had to instruct the jury on this issue were prompted by statements by defense counsel. The first time was during Defendants' opening statement. Defense counsel referred to advertisements for Plaintiffs' positions that "fully disclosed and described . . . exactly how [the salespeople] were going to get paid," emphasizing the commission system and that Plaintiffs had entered into contracts agreeing to this method of payment.[89] At side-bar, the Court noted its concern with Defendants' implication that Plaintiffs' knowledge of the commission structure could have some bearing on whether there was an FLSA violation.[90] Finding that Defendants' argument was irrelevant and potentially confusing, at the request of Plaintiffs, the Court advised the jury that "an employee cannot waive the rights to FLSA overtime or minimum wage."[91]

Later on the first day of trial, in response to defense counsel's questioning a witness about the terms of the Plaintiffs' employment contracts, the Court once again warned Defendants at a side-bar to avoid implying that Plaintiffs had somehow waived their FLSA rights simply because they had agreed to a commission-based compensation structure.[92] The Court expressed continuing concern that Defendants were introducing irrelevant evidence for this purpose.[93]

The second time the Court instructed the jury on the non-waivability of the FLSA came during the playback of a video deposition. During this playback, the witness—Peter Potje, a door-to-

---

[88] Doc. 810-1 at 5; Doc. 818 at 10; *see also* Tr. 10/2/2014 at 159:12–160:14.
[89] Tr. 9/29/2014 at 90:4–91:8.
[90] *Id.* at 91:12–92:5.
[91] *Id.* at 92:6–92:23.
[92] *Id.* at 232:12–234:15.
[93] *Id.*

-20-

Case No. 1:12-CV-00758
Gwin, J.

door salesman—testified in response to a question from defense counsel that he understood the lawsuit to be about "whether someone who has [signed independent contractor agreements] might still get paid minimum wage for time spent."[94] Plaintiffs objected to this testimony.[95] Finding Potje's statements to be not only improper testimony on a matter of law, but also an incorrect statement of the law, the Court made a corrective instruction that an employee cannot agree to waive his rights under the FLSA to minimum wage and overtime pay.[96]

Cases where a trial judge has been found to have engaged in conduct that requires a new trial have typically involved a great number of comments that amount to berating of one party or its counsel.[97] Here, there is no allegation by Defendants that the Court's tone or demeanor expressed bias against Defendants' position. The allegation is that the Court gave correct instructions of law. It did so in order to cure improper or incorrect statements, one made by defense counsel and one made by a witness.[98] The Court finds no support for Defendants' argument that a correct statement of the law can prejudice a party's case. Instead, the cases support the position that the Court may comment to "ensure that the issues [are] not obscured, to ensure that testimony [is] not misunderstood, and to move the case along."[99] In this case, the Court's brief instructions were well within its discretion to determine a question of law, ensure the integrity of the proceedings, avoid

---

[94] Tr. 10/1/2014 at 233:18–233:25.

[95] Id. at 234:2–235:13.

[96] Id. at 234:19–235:12, 236:9–236:23.

[97] E.g., United States v. Hickman, 592 F.2d 931, 934–36 (6th Cir. 1979) (When the district judge interjected over 250 times during the trial using an anti-defendant tone, and then limited defense cross-examination before taking over cross-examination himself, "the only impression which could have been left in the mind of the jury was that the trial judge was a surrogate prosecutor.").

[98] See, e.g., United States v. Houston, 110 F. App'x 536, 542 (6th Cir. 2004) (finding no error when the district judge made statements to the jury following counsels' statements regarding irrelevant legal issues).

[99] Johnson v. Philip Morris, Inc., 70 F.3d 1272, 1995 WL 704264, at *4–5 (6th Cir. Nov. 29, 1995) (unpublished table opinion).

-21-

Case No. 1:12-CV-00758
Gwin, J.

confusion of the issues, and keep the trial moving at a reasonable pace.

Defendants also assert that the Court made statements to the jury about the lack of a fraud claim by the Plaintiffs, thereby implanting the term "fraud" in their heads and biasing the jury against Defendants.[100] A review of the record, however, shows that the Court only twice referred to fraud. The first time the Court mentioned fraud was during a side-bar,[101] which could not possibly have caused any prejudice to Defendants as it was done outside the presence of the jury.[102] The second time was in response to Defendants' repeated questioning of door-to-door workers about their knowledge of the commission-based compensation agreements, which the Court had ruled irrelevant and instructed Defendants to stay away from. At this time, the Court instructed the jury that Plaintiffs "[did] not make a claim that the Defendant[s] defrauded the Plaintiffs."[103] The Court's comment was thus in effect invited by Defendant by continuing to delve into matters the Court had ruled irrelevant and possibly confusing to the jury. Further, if anything, this brief curative instruction would have *helped* Defendants, as it instructed the jury *not* to believe that Defendants had engaged in fraud. As such, the Court fails to see how this comment could have prejudiced Defendants' case.

### IV. Interlocutory Appeal

In the alternative, Defendants seek the Court's leave to take an interlocutory appeal pursuant to 29 U.S.C. § 1292(b) in order to challenge the correctness of the jury instructions regarding the

---

[100] *See* Doc. 810-1 at 5–6; Doc. 818 at 10.

[101] *See* Tr. 9/29/2014 at 234:8–234:15 ("THE COURT: I'm not sure—what do you say I don't understand? They haven't brought a fraud claim and I wouldn't instruct them, I wouldn't instruct on a fraud claim and they haven't brought a fraud claim.").

[102] *See United States v. Middleton*, 246 F.3d 825, 849 (6th Cir. 2001); *United States v. Morrow*, 977 F.2d 222, 225 (6th Cir. 1992).

[103] *See* Tr. 9/30/2014 at 24:17–25:1.

-22-

Case No. 1:12-CV-00758
Gwin, J.

outside sales exemption.[104/]

## A. Legal Standard

Litigants are generally not entitled to appellate review of court orders prior to a final judgment on the merits.[105/] In "exceptional cases," however, district courts may grant parties leave to take interlocutory appeals.[106/] To appeal under § 1292(b), a party must show: (1) the issue concerns a controlling question of law; (2) substantial ground for difference of opinion on that issue exist; and (3) immediate appeal would materially advance the ultimate termination of the litigation.[107/] "The burden of showing exceptional circumstances justifying an interlocutory appeal rests with the party seeking review."[108/]

## B. Analysis

### 1. Controlling Legal Issue

"A legal issue is controlling if it could materially affect the outcome of the case,"[109/] "such as when 'reversal of the District Court's Order would terminate the action.'" [110/] Here, Defendants say that the application of *Christopher* to the FLSA's outside salesperson exemption presents a controlling issue of law in this case.[111/]

A resolution of an interlocutory appeal in Defendants' favor, however, would not resolve this

---

[104/]Doc. 810-1 at 7.

[105/]*Gelboim v. Bank of Am. Corp.*, 135 S. Ct. 897, 902–03 (2015); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 474–75 (1978).

[106/]*In re City of Memphis*, 293 F.3d 345, 350 (6th Cir. 2002) (citations omitted); *see also* 28 U.S.C. § 1292(b).

[107/]*Negron v. United States*, 553 F.3d 1013, 1015 (6th Cir. 2009); *In re City of Memphis*, 293 F.3d at 350.

[108/]*Trimble v. Bobby*, No. 5:10-cv-00149, 2011 WL 1982919, at * 1 (N.D. Ohio May 20, 2011) (citing *In re City of Memphis*, 293 F.3d at 350).

[109/]*In re City of Memphis*, 293 F.3d at 351.

[110/]*United States S.E.C. v. Geswein*, 2 F. Supp.3d 1074, 1086 (N.D. Ohio. 2014) (quoting *Howe v. City of Akron*, 789 F. Supp. 2d 786, 810 (N.D. Ohio 2010)).

[111/] Doc. 810-1 at 9–10.

Case No. 1:12-CV-00758
Gwin, J.

case. The question of the outside salesperson exemption's applicability is not purely legal and requires factual findings. Further, with this motion Defendants challenge only one of the numerous non-dispositive factors that the jury was able to consider when determining whether the exemption applies. Even if Defendants' appeal were successful, the remedy would likely be a retrial. Thus, this factor weighs against granting the interlocutory appeal.

## 2. Substantial Grounds for Different Opinion

The second factor requires that the Court determine whether substantial grounds exist for different opinion on the issue. Substantial grounds for a difference of opinion exist when "(1) the question is difficult, novel and either a question on which there is little precedent or one whose correct resolution is not substantially guided by previous decisions; (2) the question is difficult and of first impression; (3) a difference of opinion exists within the controlling circuit; or (4) the circuits are split on the question."[112]

Here, Defendants seek to appeal whether the jury instructions correctly related what factors the jury could consider in determining whether the outside sales exemption applies. The Court recognizes that *Christopher* is a relatively recent decision that has caused some uncertainty in FLSA litigation. Nevertheless, the jury instructions were not written on a blank slate. As already discussed, the Court's instructions were based on and consistent with numerous other cases. And the Sixth Circuit itself has recently distinguished *Christopher* based on its unique facts and circumstances, and determined that it should not necessarily control other FLSA cases.[113]

The legal issues here are not particularly difficult, nor is there a clear split of authority. Some

---

[112] *In re Miedzianowski*, 735 F.3d 383, 384 (6th Cir. 2013) (citing *City of Dearborn v. Comcast of Mich. III, Inc.*, No. 08–10156, 2008 WL 5084203, at *3 (E.D. Mich. Nov. 24, 2008)).

[113] *See Killion*, 761 F.3d 5at 583–84.

-24-

Case No. 1:12-CV-00758
Gwin, J.

disagreement will almost always exist on any given legal issue, but in this case, the disagreement is not so substantial as to require an immediate decision from the Sixth Circuit to resolve it. Thus, this factor weighs against granting the interlocutory appeal.

### 3. Material Advancement of Ultimate Termination of the Litigation

Finally, the Court must consider whether an immediate appeal would materially advance the ultimate termination of the litigation. Such circumstances exist where appellate review could "appreciably shorten the time, effort, and expense exhausted between the filing of a lawsuit and its termination."[114]

The highly fact-intensive nature of the inquiry required to apply the outside salesperson exemption almost guarantees that a ruling from the Sixth Circuit in Defendants' favor would not terminate this case; at most, a new trial on liability would have to be held. The risk that the Court will be reversed at a later date, rather than immediately, is not unique to this case. Nor is it unique to this case that Defendants could possibly win on retrial, thereby making further proceedings in the district court unnecessary.

This factor works somewhat in Defendants' favor, however, since the upcoming damages phase will require some form of individualized proof of the number of under-compensated hours worked by each class member. The Court would not stay the proceedings during the pendency of the appeal. Thus, if the Court were to allow the interlocutory appeal as to the liability phase issues while the damages phase is ongoing, it could somewhat shorten this litigation overall.

Nevertheless, the resolution of the jury instruction issues on appeal would not "substantially

---

[114] *Berry v. Sch. Dist. of City of Benton Harbor*, 467 F. Supp. 721, 727 (W.D. Mich. 1978).

Case No. 1:12-CV-00758
Gwin, J.

alter the course of the district court proceedings."[115] Even if the appeal were granted, the damages

phase would continue unabated. The only change to come from an interlocutory appeal would be

to require any retrial on liability to be held sooner rather than later. The Court therefore finds that

this factor also weighs against granting the interlocutory appeal.

## V. Conclusion

For the foregoing reasons, the Court **DENIES** Defendants' motion for judgment as a matter

of law, **DENIES** Defendants' motion for a new trial, and **DENIES** Defendant's motion to certify an

interlocutory appeal.

IT IS SO ORDERED

Dated: March 10, 2015                         s/      *James S. Gwin*
                                              JAMES S. GWIN
                                              UNITED STATES DISTRICT JUDGE

---

[115] *W. Tenn. Chapter of Assoc. Builders & Contractors, Inc. v. City of Memphis*, 138 F. Supp. 2d 1015, 1026 (W.D. Tenn. 2000); *cf. White v. Nix*, 43 F.3d 374, 378–79 (8th Cir. 1994) ("When litigation will be conducted in substantially the same manner regardless of [the court of appeals'] decision, the appeal cannot be said to materially advance the ultimate termination of the litigation.").

# EXHIBIT B



‖ ‖‖‖ ‖‖‖‖

**STATE OF NEW YORK**
**DEPARTMENT OF LABOR**
GOVERNOR W. AVERELL HARRIMAN
STATE OFFICE BUILDING CAMPUS
ALBANY, NEW YORK 12240

**UNEMPLOYMENT INSURANCE DIVISION**

September 21, 2007

NEW YORK ENERGY SAVINGS CORP
DBA US ENERGY SAVINGS
6345 DIXIE RD STE 200
MISSISSAUGA ON  L5T 2E6
CANADA

In reply refer to:
LD3    47-48780 3

Re: [ Redacted ]
  TERRENCE D KIDD

Dear Employer:

  This is in reference to an unemployment insurance claim filed by Terrence D. Kidd, social security number [ Redacted ] and the fact that all of the services performed were considered by you to be those of an independent contractor and not an employee.

  The following information was obtained in a statement from Terrence D. Kidd or from information provided by you:

1) Terrence D. Kidd performed services for you selling contracts for natural gas and electricity to businesses and residences.

2) All contracts had to be approved by you.

3) There is no indication Mr. Kidd is in business for himself.

4) He obtained his position with you by responding to your help wanted advertisement.

5) You instructed Mr. Kidd on when the work was to be completed, where the work was to be performed and how the work was to be performed.

6) He was required to report to you on a regular basis.

7) He was required to submit reports.

8) You reviewed or inspected his work.

9) You provided him with training so that he would perform his services to your specifications.

10) Mr. Kidd could not take time off without your prior knowledge and approval.

11) His rate of pay was established by you.

12) You provided him with a metro pass.



EXHIBIT
16

13) Although you indicate that Mr. Kidd did not have a specific territory, you also indicated he only performed services in New York.

14) He wasn't required to attend meetings but if he missed a meeting, he was required to obtain the necessary information through informal means before he could recommence marketing.

This information indicates you exercised or reserved the right to exercise sufficient supervision, direction, and control over the claimant's services to establish an employer-employee relationship. Therefore, it is our determination the claimant was your employee.

It will be necessary for you to submit amended quarterly reports and pay contributions on the earnings of Terrence D. Kidd and all other persons similarly employed beginning with at least the third quarter of 2005. We suggest you submit these reports and pay the contributions due as soon as possible since interest is assessed on the late payment of contributions from the due date to the date paid. We are enclosing reporting forms for this purpose.

If you disagree with this determination, you may request a hearing, in writing, within thirty days from the date of this letter. If you request a hearing, please let us know the exact basis of your request.

Sincerely,

Donna Swinarski

Donna Swinarski
U.I. Reviewing Examiner
Liability and Determination Section
518 457-4365


Encl: REPORTING FORM(S) (8)

Confidential

STATE OF NEW YORK
## DEPARTMENT OF LABOR
GOVERNOR W. AVERELL HARRIMAN
STATE OFFICE BUILDING CAMPUS
ALBANY, NEW YORK 12240

**UNEMPLOYMENT INSURANCE DIVISION**

September 29, 200

NEW YORK ENERGY SAVINGS
CORP DBA US ENERGY SAVINGS
6345 DIXIE RD STE 200
MISSISSAUGA ON L5T 2E6
CANADA

In reply refer to:
LD4    47-48780 3

Re:    Redacted
       Chester Cohen

Dear Employer:

This is in reference to an unemployment insurance claim filed by Chester Cohen, social security number Redacted and the fact that all of the services performed were considered by you to be those of an independent contractor and not an employee.

The following information was obtained in a statement from Chester Cohen:

1. He performed services for you selling contracts door to door for electricity and natural gas to residential and business customers.

2. He was required to devote a minimum number of hours per day or week to sales.

3. You provided training to help him perform his job. The training was mandatory and conducted at your company facility. Training covered product information, sales techniques, company and policy procedures and sales presentations.

4. You established the prices and Mr. Cohen could not alter prices without your approval.

5. All contracts and customers were subject to your approval.

6. You provided sales forms and promotional material.

7. He was required to report to a supervisor daily by telephone and weekly in person.

8. You accompanied him on sales calls and critiqued and evaluated his work.

9. He was required to attend weekly meetings which covered new product information, training, evaluation of performance, productivity and product prices.

Confidential

10.  You established the rate of pay which was a commission based on number of
     contracts sold.

11.  He was required to follow your specific sales methods.

12.  You were responsible for contact with uncollectible customer accounts.

13.  He did not perform similar services for other companies while working
     for you.

This information indicates you exercised or reserved the right to exercise
sufficient supervision, direction, and control over the claimant's services to
establish an employer-employee relationship. Therefore, it is our determination the
claimant was your employee.

It will be necessary for you to submit amended quarterly reports and pay
contributions on the earnings of Chester Cohen and all other persons similarly
employed beginning with at least the third quarter of 2005. We suggest you
submit these reports and pay the contributions due as soon as possible since
interest is assessed on the late payment of contributions from the due date to
the date paid. We are enclosing reporting forms for this purpose.

If you disagree with this determination, you may request a hearing, in
writing, within thirty days from the date of this letter. If you request a
hearing, please let us know the exact basis of your request.

Sincerely,

Nancy Todaro
U.I. Reviewing Examiner
Liability and Determination Section
518 457-7019

Encl: REPORTING FORM(S)

Confidential

Just Energy 002971



STATE OF NEW YORK
DEPARTMENT OF LABOR
GOVERNOR W. AVERELL HARRIMAN
STATE OFFICE BUILDING CAMPUS
ALBANY, NEW YORK 12240

UNEMPLOYMENT INSURANCE DIVISION

August 6, 2008

NEW YORK ENERGY SAVINGS CORP
DBA US ENERGY SAVINGS
6345 DIXIE RD STE 200
MISSISSAUGA ON  L5T 2E6
CANADA

In reply refer to:
LDI    47-48780 3

Re: [ Redacted ]
    George Parker

Dear Employer:

This is in reference to an unemployment insurance claim filed by George
Parker, social security number [ Redacted ] and the fact that all of the services
performed were considered by you to be those of an independent contractor and
not an employee.

Since you did not respond to our letter of July 3, 2008, the following
information was obtained from George Parker and a copy of the Independent
Contractor Agreement:

1. The claimant worked for you as a salesman assisting in obtaining natural
   gas and electricity contracts from consumers.

2. The claimant is not in his own independently established business
   advertising his services to the general public.

3. The claimant was required to turn in weekly reports.

4. Wages and compensation to the claimant was determined by you.

5. The claimant was allowed to draw against further commissions.

6. The claimant was required to repay overdraws.

7. The claimant was prohibited from performing services for other business
   entities that compete directly with the business of USESC.

8. You advised the claimant as to when the work was to be completed.

9. The claimant could not refuse work assignments.

10. You provided booklets, contracts, and pamphlets in order to help the
    claimant perform his duties.

11. The claimant could not take time off without your knowledge or approval.

This information indicates you exercised or reserved the right to exercise sufficient supervision, direction, and control over the claimant's services to establish an employer-employee relationship. Therefore, it is our determination the claimant was your employee.

Additionally, also note that the fact that you have indicated that the relationship of parties was that of independent contractor is irrelevant. The mere designation by the employer of an independent contractor status, even if accepted by the individual, is not conclusive. A written or verbal agreement does not preclude an examination of the facts to determine whether the performance of the services is subject to supervision, direction, or control. If the circumstances demonstrate either the exercise of, or the right to exercise, such supervision, direction, or control, and employer-employee relationship exists.

It will be necessary for you to submit amended quarterly reports and pay contributions on the earnings of George Parker and all other persons similarly employed beginning with at least the third quarter of 2005. We suggest you submit these reports and pay the contributions due as soon as possible since interest is assessed on the late payment of contributions from the due date to the date paid. We are enclosing reporting forms for this purpose.

If you disagree with this determination, you may request a hearing, in writing, within thirty days from the date of this letter. If you request a hearing, please let us know the exact basis of your request.

Sincerely,

Mark Pezzula
UI Reviewing Examiner
Liability and Determination Section
518 457-3695

Encl: REPORTING FORM(S)



# DEPARTMENT OF LABOR
GOVERNOR W. AVERELL HARRIMAN
STATE OFFICE BUILDING CAMPUS
ALBANY, NEW YORK 12240

UNEMPLOYMENT INSURANCE DIVISION

May 29, 2008



NEW YORK ENERGY SAVINGS CORP
DBA US ENERGY SAVINGS
6345 DIXIE RD STE 200
MISSISSAUGA ON  L5T 2E6
CANADA

In reply refer to:
LD8    47-48780 3

Re: [_____Redacted_____]
     Claimant: Matthew Brown

Dear Employer:

This is in reference to an unemployment insurance claim filed by Matthew Brown, social security number [ Redacted ] and the fact that all of the services performed were considered by you to be those of an independent contractor and not an employee.

The following information was obtained in a statement from Matthew Brown or from information provided by you:

1. He performed services for you by going door to door soliciting contracts for natural gas to residential and business customers.

2. He was not in business for himself.

3. He did not advertise services to the general public.

4. He did not perform similar types of services for others while working for your corporation.

5. He completed a job application and/or submitted a resume.

6. He was instructed on where and how the work was to be performed.

7. He was required to report how many orders he got each day.  This was done every night by phone.

8. He was required to work eight hours in a day.

9. His work was reviewed or inspected.

10. He was required to make corrections.

11. He was provided with supplies including; hat and jacket.

12. Training was provided.

Confidential

13. He could not take time off without the knowledge or approval of your corporation.

14. He could not refuse work assignments.

15. He was required to attend a one hour meeting in Buffalo six days a week.

16. He was expected to meet a quota of 20-30 deals a week.

This information indicates you exercised or reserved the right to exercise sufficient supervision, direction, and control over the claimant's services to establish an employer-employee relationship. Therefore, it is our determination the claimant was your employee.

It will be necessary for you to submit amended quarterly reports and pay contributions on the earnings of Matthew Brown and all other persons similarly employed beginning with at least the third quarter of 2005. We suggest you submit these reports and pay the contributions due as soon as possible since interest is assessed on the late payment of contributions from the due date to the date paid. We are enclosing reporting forms for this purpose.

If you disagree with this determination, you may request a hearing, in writing, within thirty days from the date of this letter. If you request a hearing, please let us know the exact basis of your request.

Sincerely,

Scott C. Walker

Scott Walker

Liability and Determination Section
518 485-8598

Encl: REPORTING FORM(S)

Confidential